Case 16-15-10, Toulon v. Continental Casualty, and it's Mr. Duncan. Hi. Good morning. Good morning. May it please the Court, Robert Duncan on behalf of Appellant Sophie Toulon, we're here on review of the lower court's order dismissing the case based on 12b-6. This plaintiff, Appellant, had filed a four-count complaint that arises out of long-term care policy that she purchased back in 2002. She alleged fraud, fraudulent concealment, unjust enrichment, and violations of the Illinois Consumer Fraud Act. As a preliminary matter, to address I guess what might be considered a housekeeping measure, there is a pending motion for conditional relief based on concerns regarding subject matter jurisdiction in the lower court. You know, if you're right that Continental sold Toulon a policy with an artificially low premium, then during the ten years that she had the policy, she was receiving a benefit far above that what she paid for. Do you think that should make any difference in our analysis? No, Judge, I don't think it should make any difference at all, because I think the pleadings lay out that at the time Continental sold Toulon the policy, it knew, based on the actuaries that it has and its ability to forecast the future, that it was very unlikely that Toulon was going to make a claim during that ten-year period. So the value of this policy is actually greater as the individual or the purchaser of the policy gets older. So I don't think that she was receiving any material benefit during that ten-year period, at least one that would cause... I beg your pardon? She had insurance in effect, right? She had insurance in effect, but rather the benefit was going to increase after the expiration of the ten-year rider. So while she was receiving a benefit, the benefit was intended to be collected on, if at all, or likely to be collected on, if at all, at the expiration of the ten-year rider. You would agree that having health insurance is valuable even if you remain healthy during the year, correct? I'm not saying it has no value during that ten-year time. I'm just saying that it has greater value at the expiration of that ten-year rider. What do we make of the fact, though, that she paid extra to keep premiums, in essence, either flat or under control for those ten years? That's an extra charge, right? It is. It's sold as a rider. So that tells us that that assurance is valuable, right? Yes, Your Honor. So what would the natural inference be after that cap comes off? The natural inference would be that the rates were then subject to change, or they may be increased, but... And what age was she when she bought the policy? She was 68 years old. So the question is, what are the appropriate premiums for somebody who's 68 and somebody who's 78, right? Yes, Your Honor. Isn't that answer pretty obvious, at least in general terms? I think in general terms it may be obvious, Judge, but I think what Tulin believed at the time she purchased the policy was that she was going to have a set policy limit for the ten-year period based on the rider. But at the conclusion of that period, she was given guidelines that allowed her to assess the affordability of the policy, determining whether or not she'd be able to afford it. Those are the regulatory disclosures, the 15 to 20 percent? Those disclosures were made pursuant to the Illinois Administrative Code, but there was also a notice to the applicant that provided her with specific guidelines. Those guidelines were supplied to her in accordance with the Illinois Administrative Code as well that requires long-term care insurers to supply suitability guidelines. It's an indication of how important the state believed that the affordability of these policies should be considered and actually put the onus on continental casualty to supply those guidelines. What about the worksheet that she never utilized, as I understand it? Well, it's not that she didn't utilize it, it's just that she didn't fill it out. Or calculate it, right. So she signed it, and signing it and returning it is a condition of issuing the policy. So the worksheet was required by the code section that Judge Hamilton referred to, but what was included in there was a reference to a possible rate increase of, for example, 20 percent. That information, Continental elected to include. It wasn't required to be included, and at the time that it elected to include that information, we've alleged and believed that Continental knew that that was erroneous. It was not in accord with the truth of the matter, and that was that at the expiration of the 10-year period, the rates were going to be increased significantly. What disclosure do you think would have been sufficient? I think any disclosure that didn't reference rates that were so far afoul of what was actually going to happen. Don't tell me what's not sufficient. Tell me what would have been sufficient, please. At the conclusion of the rider period, the rates may double. I think the disclosure depends on the evidence that we have yet to be able to ascertain. Is it your contention that Continental knew with 100 percent certainty that the rate would increase more than 20 percent? Because in the brief, you seem to state that in several places. Yes, I think they knew with absolute certainty that the rate was going to increase far more than 20 percent. Did they know that it was going to increase 76.5 percent? I don't know that to be true. Would she have had a viable claim if the rate had only increased by 20 percent? I don't believe so, because I think that the information that she was provided at the time she purchased the policy reasonably advised her of a rate increase in the range of 15 to 20 percent. It could even increase beyond 20 percent. There was no cap, and plaintiff doesn't make any allegations that there was a promise to cap rate increases at 20 percent. But she was provided with information that she was instructed to use as a guideline to determine whether or not this policy was going to be affordable for her, not only at the time that she purchased it, but on into the future. And it's those guidelines that misled her and constitute a fraudulent misrepresentation. Do you happen to know if other long-term disability insurance companies had this same issue? In other words, a sudden and drastic increase in premiums around the same time? Some have and some haven't. Those that haven't had significantly higher premiums at the time that they were sold, back in the same time period that Tulin bought hers. The insurance companies as a whole had identified a marketplace for long-term care insurance. It was a significant portion of the population that was aging and was very concerned about, as many of us are, our end-of-life situation and who's going to afford long-term care if and when it becomes necessary. Well, let me ask you this. If you can make a bare allegation that Continental knew the increase would happen to 100% certainty, can Continental ask the Court to take judicial notice of the fact that this was happening across the industry at that time? Number one, I don't believe it was a bare assertion. I think we've supported our claim that Continental knew that this rate increase was inevitable based on the experience that they had in the industry, the actuarial standards that existed at the time, as well as their own internal empirical and historical data that suggested that the lapse rates that had been traditionally utilized to price long-term care policies were not appropriate because of the type of people that were buying them. These are conservative, long-term planning folks that, once locked into a 10-year rate-stabilizing rider, are going to continue to make their payments. I don't believe that the Court can take judicial notice that others, simply because other long-term care insurers in the marketplace were also trying to grab market share by utilizing inappropriate actuarial data or simply charging lower premiums. I don't think the Court can take judicial notice of that fact because there are insurance companies out there that were selling long-term care insurance policies that have not had to implement these significant rate increases. Genweld, for example, has not had to increase their long-term care insurance premiums. So I don't think it would be appropriate for the Court to take judicial notice of that. But again, I do believe that we have supported our allegations of knowledge with sufficient facts that put Continental in a position that they did know based on their assessment. If we were to reverse, what limits do you think we would have to suggest about what an insurance company must disclose about future rates? We're talking here about trying to predict more than 10 years in advance, right? And they happen to be 10 years with pretty wild swings in capital markets, right? Not to mention uncertainty about health care costs, right? So what would an insurance company have to disclose and not have to disclose in order to meet your standards? Well, I think now, based on what we've learned over the course of the last 10 years, I think that they would have to disclose that, expressly disclose, that rates could or may increase in any amount, okay? They have to be transparent about the fact that rates can go up 76.5 percent. Rates may double in the future. Rates may cause this policy to be unaffordable. At the time that they issued this policy... Why not simply ask, okay, I mean, at the time she bought this, okay, I'm 68, what would the price be for my cousin who's 78? Presumably it was being priced and sold to such folks at that time, right? Presumably, Judge. We don't know that. We don't know who the precise target... Is it correct that the plaintiff bought this from her husband? Her husband was the producer, yes. Is that relevant here? The significance or insignificance of him being the producer is unknown at this point because we don't know whether she was privy to any additional information or he provided her with any additional information that would or would not have been provided to other purchasers of the policy. At this point, the impact of that is unknown. Has she stayed with him? She has. And she's continued to pay the premiums on her policy at the increased rate. But at the end of the day, there was a misrepresentation regarding the likelihood of future rate increases. They portrayed a known certainty as a mere possibility, and whether that survives a fraud analysis should be looked at separately from whether it survives an analysis under the Illinois Consumer Fraud Act. I'll make one quick point and then sit down. I believe under the Illinois Consumer Fraud Act, there's a much broader or greater protection afforded consumers like Tulin, and it's under that act that this particular conduct, meaning giving guidelines that were rendered meaningless by a known future rate increase, is unlawful. With that, I'll reserve the remainder of my time for rebuttal. Thank you. Okay. Mr. Austin, good morning. Good morning. Good morning, Your Honors. My name is Brent Austin. I represent Continental Casualty. Can you tell me if it's common for applicants to weigh the filling out of the worksheet? I think it's unusual. I don't know if it had to do with the relationship between the agent, her husband, and her. I think it's relevant that she did not fill out the worksheet and yet is relying heavily on the worksheet as the focal point of her fraud claim. You mean like, honey, don't worry about it. I'm going to take good care of you? I mean, that could have happened, I suppose. But if you're going to base a fraud claim on a worksheet, you have to allege that you read and relied on the worksheet, and the worksheet has to contain material misrepresentation of an actual fact that exists at the time, and that's not what we're talking about here. Does the safe harbor protect the worksheet even if all of the statements in it aren't set forth in the regulation? I mean, like what if everything came verbatim from the regulations but one statement insured eternal life? And where can I buy it? I think that in that case, the safe harbor would give you a safe harbor for the statements that are compelled by the state or that were written by the state, and in this case it's indisputable that the worksheet was required by the state, and the statements that are challenged in the worksheet come from the regulations. They're bracketed in the draft worksheet that the state prepared, but these are all state statements, and I think that does bring you within the safe harbor for the Consumer Fraud Act. But as important, I mean, these statements are either of facts that are indisputably true or they're not statements of facts, and there isn't a misstatement of fact alleged anywhere in this complaint. At best, what is alleged is that there is an implied misstatement about the likelihood of a rate increase in the future and the scope of that rate increase. Yeah, but what if her claim of misrepresentation comes from an implied message that an applicant gets from reading all of the statements together in context rather than any one particular sentence or paragraph? Well, you have to read them in context then, and if the statements that you're relying on are either cautionary statements that rates can go up and that you need to be careful in your financial planning in the policy that you buy, or the statement is these rates are subject to change or we may change these rates, drawing an implication from that, that therefore there's going to be a rate increase but it's going to be small, I think is a fair stretch. And I think the case law is pretty clear that where the claim is that you essentially misstated an opinion or you misstated a projection or you made a promise that you didn't intend to keep, all of which generally is what, in one form or another, is what the plaintiff is alleging here, that none of those allegations are sufficient to state a fraud claim under Illinois law. And really, if you could get around that by saying, yes, but the defendant knew that the opinion was untrue at the time it was implied, then you wouldn't have any case law saying that projections can't be the basis of a fraud claim because simply saying they knew is enough to get by a 12B6 and a 9B motion, and the case law is to the contrary on that. And here, the argument is even stronger in Continental's favor. What do we make of the language in, isn't it Rule 9B, that says knowledge may be alleged generally? Well, here, but the case law, federal case law also says that there has to be some plausibility to the allegation. Sure. How about the defense knew enough, defendant knew enough how to price the policy out for 10 years, right? Well, it knew enough to price the policy and sell a rider that guaranteed it for 10 years. Obviously, the pricing of the policy did not work out as the defendant anticipated because there was a rate increase. Well, why is that obvious that that's not expected? If I buy a 10-year level premium term life insurance policy, I would expect a pretty big increase if I want to continue in the 11th year, right? I think that's fair. Why is this any different, that both sides can foresee this? I think a policyholder clearly should expect from buying this policy and having a 10-year lock. And the policy is saying it's subject to change and we may change the rates, that there is a serious risk that the rates are going to be increased. Now, from the defendant's perspective, the defendant may believe that rates may have to increase as well. The question is, did the defendant make a misrepresentation about an intention to actually raise the rates across 50 states and get 50 states to approve the rate increase 10 years in advance? And that's not a plausible allegation. And even if it was a plausible allegation, the question then is how did that translate into a misrepresentation of fact to the plaintiff? Because if I'm making a promise to you, I may raise your rates, but I actually think that I probably will raise your rates, or I may raise your rates, but I think that if I do raise your rates, it's going to be a big rate increase. And I don't tell you that. We're not talking about a statement of fact. We're talking about a promise that's embodied in a contract, and that doesn't form a basis for a fraud claim. Would it be fair to assume that the defendant continued to sell these policies during those 10 years? Well, Continental sold them from 1998 to 2003. Oh, it stopped? Yes. Okay. All right. And this issue has come up in case law. Judge Rovner, you asked about taking judicial notice of rate increases across the industry. Obviously, we cite the Rakes case, which is out of the Eighth Circuit, and that involved a 75% rate increase, where the challenge was you underpriced it, knowing that you were going to raise the price, and then you raised the price, and that was fraud. And the court concluded that that is not a basis for a fraud claim because the possibility of a rate increase was memorialized in the contract. And raising questions about whether or not the defendant priced the policy correctly doesn't give rise to either an omission claim or a misrepresentation claim. And then in the Crichton case from the Seventh Circuit, that doesn't involve long-term care. Rakes involved actually long-term care. Crichton involved health insurance, but the allegation again was the same. You underpriced it. You had bad underwriting standards or knowingly false underwriting standards, and you failed to disclose them to the plaintiff. And in Crichton, there was actually an underwriting standard that they focused on. It said this particular practice, you should have disclosed to the plaintiff. If you didn't, then that gives rise to a fraud claim. And the Seventh Circuit said that on a motion to dismiss, that does not state a fraud claim. And I think those cases are on point for what we're talking about here because the factual scenario is basically the same. Could you address, Mr. Austin, the plaintiff's hypothetical from their reply brief about let's say a drug manufacturer who knows about a side effect that is highly likely but discloses simply that it's possible? Well, a defective product is a product that either has a known defect or a likelihood of a defect. It's going to fail. Your brakes are going to lock or your drug is going to have a side effect, and you misrepresent the likelihood. Side effects don't mean the product is defective. No, unless you conceal it or misrepresent it. But there you're talking about a fact that's alleged to be known by the defendant at the time the product is sold. It's a likelihood, right? Well, it's a likelihood of a product failure, yes. I mean, in the case of a prescription drug, if I'm selling a prescription drug and there is, and I have reason to believe that there's an 85% chance that it will cause a heart attack, and I represent to the buyers that it has a very low probability. Then you're probably going to jail, right? But let's talk about serious side effects, but they don't necessarily indicate a defect. That's simply a side effect of the drug. But there's a difference between a majority of patients experiencing it and a mere possibility that they would experience it. That's correct. But the question here is did the basis of the pricing of your product, was that basis accurate and could it withstand 10 years' worth of experience? It's not a situation here where the plaintiff's alleged in a conclusory fashion that Continental knew 10 years ago, or longer now, that it would be subject to a 76% rate increase. Oh, a big increase. A big rate increase. It made no representation to the plaintiff either way about what kind of a rate increase would happen. There's no representation at all about how the policy was priced. All that's disclosed is the truth, which is that the policy is subject to a rate increase. And so here the disclosure of the defect, if you want to call it a defect, was disclosed, the scope of the defect, the scope of the rate increase, was never discussed either in the contract or in the marketing materials. And the allegation is that the defendant somehow knew the scope of it 10 years ago when the product was sold and failed to disclose it. And what I would say is that that allegation is implausible, that a defendant would have a scheme to do that when the rate increases have to be approved in 50 states. And there was no duty to warn in this case because in an omissions case the duty to warn only arises if there's a fiduciary duty, a special relationship, that sort of thing. And I don't think Ms. Toulon is even contending that that sort of thing exists here. So I think that's an important distinction. I want to make a mention because I'm running out of time. I want to make a mention about subject matter jurisdiction. It was the product of a great deal of filings leading up to this. I have two motions on file. To supplement the record, they were in response to two separate orders asking for further statements about jurisdiction. They contain two affidavits that I think either one on its own shows that there's minimal diversity in this case. Together, I think it's overwhelmingly clear that there's subject matter jurisdiction, and I'd ask the Court to grant that motion. And just by way of caution, if there's any question about whether or not to grant that motion, I think the question really is should the district court make a finding of fact about subject matter jurisdiction. I don't think that's necessary here, but I think that's the most drastic result that should happen if there's any doubt left about the existence of minimal diversity. If there aren't any other questions, I'll yield. Thank you very much. How much time? Three. Is that three minutes? Yeah. Excellent. Really quickly on the issue of subject matter jurisdiction, I think that the relief to the extent the Court believes that the plaintiff is not satisfied, the minimal diversity requirement, the only relief is dismissal without prejudice and voiding the lower court's orders. That being said. Are you telling us we don't have jurisdiction over the case you brought? No. I'm saying based on the Court's concerns and depending on this Court's reading of Section 1332, in the specific words, any member of a class of plaintiffs, if that required that a named plaintiff be diverse from the defendant, and as a result the plaintiff has failed to establish the minimal diversity requirement under CAFA, then this Court, based on its indications and some of its past orders, may not have jurisdiction. That being said, well, to I guess polish the point, though, the defendant or the appellee supplied this Court with the names or identities and states of citizenship of putative class members that reside outside of the state of Illinois, potentially curing this Court's concern with establishment of minimal subject matter jurisdiction. Tulin was not in a position, had never been in a position, of being able to identify those individuals or their states of citizenship. The scope of the rate increase was known at the time. CNA and Continental Casualty are in the business of knowing what the future holds. That's how they make their money. They employ hundreds, if not thousands, of actuaries to determine that. Knowing that a significant rate increase was coming and would be implemented at the end of the 10-year period. They provided guidelines, and they provided a reference point of 15% to 20% for insureds to determine the affordability of the policy. That forms the basis of Tulin's fraud claims, her fraudulent omissions claims, and her ICFA claims. Thank you for your time. Thank you so much. Thanks to one and all. Thank you.